**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
NOVEMBER 1, 2022
In the Office of the Clerk of Court
WA State Court of Appeals Division III

COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| BARBARA SILVEY, on behalf of herself and all others similarly situated, | ) ) ) | No. 38047-5-III |
| Appellants, | ) ) ) | ORDER GRANTING MOTION |
| v. | ) ) | TO PUBLISH OPINION |
| NUMERICA CREDIT UNION, | ) ) | |
| Respondent. | ) ) | |

THE COURT has considered the Respondent's motion to publish the court's

opinion of August 9, 2022, and the answer and reply thereto, and is of the opinion the

motion should be granted. Therefore,

IT IS ORDERED, the motion to publish is granted.

PANEL: Judges Siddoway, Fearing, Pennell

FOR THE COURT:

_____
LAUREL H. SIDDOWAY
Chief Judge

**FILED**
**AUGUST 9, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BARBARA SILVEY, on behalf of herself and all others similarly situated, | ) ) ) | No. 38047-5-III |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| NUMERICA CREDIT UNION, | ) ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Barbara Silvey brought a putative class action against

Numerica Credit Union for breach of contract and related claims, contending that

contrary to its contracts with members, Numerica used her "available" checking account

balance rather than her larger "ledger" or "actual" balance to determine her liability for

overdraft fees. Concluding that Numerica's agreements could not reasonably be read to

support Ms. Silvey's construction, the trial court granted Numerica's CR 12(b)(6) motion

to dismiss her contract-related claims.[1] We agree and affirm.

---

[1] Ms. Silvey had also alleged that Numerica violated its agreement to charge insufficient fund (NSF) fees on only a merchant's first presentation of an item for payment that is returned unpaid, not on any additional presentations of the same item. This claim, which survived Numerica's motion to dismiss, was later settled and voluntarily dismissed with prejudice.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38047-5-III
*Silvey v. Numerica Credit Union*

BACKGROUND ON OVERDRAFT FEE PRACTICE,
REGULATION, AND RELATED CLASS ACTION LITIGATION

We begin with an overview of the Federal Reserve Board's (Board's) 2009 amendment of regulation E, implementing the Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693. Not only did the amendment identify when financial institutions can assess overdraft fees for paying one-time automated teller machine (ATM) and one-time debit card transactions that overdraw a consumer's account, but it also provides a helpful historical background of overdraft services. As explained by the Board:

> Historically, if a consumer tried to make a payment using a check that would overdraw his or her deposit account, the consumer's financial institution used its discretion on an ad hoc basis to determine whether to pay the overdraft. If an overdraft was paid, the institution usually imposed a fee on the consumer's account. . . .
>
> . . . .
>
> In the past, institutions generally provided overdraft coverage only for check transactions. In recent years, however, the service has been extended to cover overdrafts resulting from non-check transactions, including ATM withdrawals, debit transactions at POS [point of sale], on-line transactions, preauthorized transfers, and ACH [automated clearing house network] transactions.

*See* Electronic Fund Transfers, Final Rule, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009). As the Board's release publishing the rule explains, "From the industry's perspective, automated overdraft services enable institutions to reduce the cost of manually reviewing individual items, and also ensure that all consumers are treated consistently with respect to overdraft payment decisions." *Id.* at 59,034.

2

No. 38047-5-III
*Silvey v. Numerica Credit Union*

The reason for the amendment to Regulation E was the strongly contrasting view of consumer advocates. According to the Board's release, "consumer advocates assert that overdraft transactions are a high-cost form of lending that trap low- and moderate-income consumers into paying high fees." *Id.* An urban legend at the time was the $39 latte, accounted for by a $35 overdraft fee because the consumer swiped a debit card for a $4 latte with only $2 in her account.[2] Most overdraft fees are paid by a small fraction of bank customers: as of 2014, 8 percent of customers incurred nearly 75 percent of all overdraft fees.[3] "Because of these costs, consumer advocates contend that most consumers would prefer that their bank decline ATM or debit card transactions if the transactions would overdraw their account." *Id.* at 59,034.

After publication of proposed rulemaking, public comment, and consumer testing, the Board's final rule adopted a requirement that customers affirmatively opt-in to overdraft protection for their ATM withdrawals or one-time debit card transactions. Institutions are required to provide consumers with a notice explaining its overdraft

---

[2] Ed Mierzwinski, *Today, CFPB to Announce Overdraft Fee Investigation, Unveil "Penalty Box" Disclosure, Possibly End $39 Lattes*, U.S. PIRG (Feb. 22, 2012), https://uspirg.org/blogs/eds-blog/usp/today-cfpb-announce-overdraft-fee-investigation-unveil-penalty-box-disclosure [https://perma.cc/N4M4-F84H].

[3] CONSUMER FIN. PROT. BUREAU, DATA POINT: CHECKING ACCOUNT OVERDRAFT (July 2014), https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf [https://perma.cc/5N76-C3AZ].

No. 38047-5-III
*Silvey v. Numerica Credit Union*

service and give the consumer a reasonable opportunity to affirmatively consent. *Id.* at

59,040.

The 2009 amendments, which became effective in 2010, protect consumers from

these overdraft fees as long as the consumer does not opt in to the additional overdraft

protection. For consumers who *have* nevertheless opted in, a spate of class action

lawsuits has followed based on consumers' claims that charges for the overdraft

protection have been imposed more frequently than permitted by the agreement signed by

the consumer. These consumers allege they were promised that in determining their

overdraft status, their bank would look only at settled transactions (the "ledger" or

"actual" balance of their account) without discounting that balance for funds that were

not available to the customer (their "available balance") either because there was a partial

hold on a large deposit or because the consumer had used their debit card for a charge

that was approved and pending, but had not yet been charged against their balance.

As described by the Consumer Financial Protection Bureau (CFPB),

> [a] ledger-balance method factors in only settled transactions in calculating
> an account's balance; an available-balance method calculates an account's
> balance based on electronic transactions that the institutions have
> authorized (and therefore are obligated to pay) but not yet settled, along
> with settled transactions. An available balance also reflects holds on
> deposits that have not yet cleared.

CFPB, *Supervisory Highlights*, Winter 2015, at 8, https://files.consumerfinance.gov

/f/201503_cfpb_supervisory-highlights-winter-2015.pdf [https://perma.cc/2PK6-MFGA].

4

No. 38047-5-III
*Silvey v. Numerica Credit Union*

Ms. Silvey filed her action against Numerica alleging that she and other class members were led by Numerica to believe that it would rely on their ledger balance in assessing overdraft fees. Whether an institution uses a ledger or available balance is a matter of contract between the parties, so the viability of Ms. Silvey's suit turns on the meaning of her contract with Numerica.

THE PRESENT ACTION

Barbara Silvey, a resident of Spokane, has a personal checking account with Numerica. She alleges that Numerica breached its contract by charging fees between December 17, 2017, and April 4, 2018, on five items that did not overdraw her account. The payments on which she alleges she was assessed fees ranged in amount from $12 to $50.

As evidence of her contract with Numerica, Ms. Silvey attaches three documents to her complaint. The first, attached as exhibit A, is entitled Membership and Account Agreement (Account Agreement). The second, attached to Ms. Silvey's complaint as exhibit B, is a several-page personal fee schedule showing changes in terms effective September 1, 2017 (Fee Schedule). The document and its attachments predate all of her complained-of transactions. Finally, attached to her complaint as exhibit C is what Ms. Silvey describes as "another contract document," entitled Member Overdraft Protection (Overdraft Protection). Clerk's Papers (CP) at 24-34, 12.

No. 38047-5-III
*Silvey v. Numerica Credit Union*

Ms. Silvey's Account Agreement describes a handful of other documents to whose terms and conditions she agreed to by opening an on-line account or by signing an account card: an "Account Card, if applicable, the Funds Availability Policy Disclosure, Truth-in-Savings Disclosure, Electronic Funds Transfer Agreement and Disclosure, Privacy Notice Disclosure and any Account Receipt accompanying this Agreement, and the Credit Union's Bylaws and policies, and any amendments to these documents from time to time which collectively govern your Membership and Accounts." CP at 24. None of these is attached to her complaint.

In granting Numerica's motion to dismiss Ms. Silvey's claim, the trial court relied in part on provisions of the Account Agreement that disclose delays that apply before funds will be fully available in her account. It also relied on provisions disclosing that payments and transfers from her account may not be made unless the funds in her account are both sufficient and available.

The trial court relied on section 8, subsection (d) of the Account Agreement, captioned "Deposit of Funds Requirements; Final Payment," which provides in part:

> All Items or Automated Clearing House (ACH) transfers <u>credited to your account are provisional</u> until we receive final payment.

CP at 538.

It relied on section 10 of the Account Agreement, captioned "ACH & Wire Transfers," which provides in part:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38047-5-III
*Silvey v. Numerica Credit Union*

> We are not obligated to execute any order to transfer funds out of your account if the amount of the requested transfer plus applicable fees exceeds the <u>available funds</u> in your account.

*Id*.

It relied on section 12, subsection (a) of the Account Agreement, captioned

"Transaction Limitations; Withdrawal Restrictions," which provides in part:

> We will pay checks or drafts, permit withdrawals, and make transfers from <u>available funds</u> in your account. <u>The availability of funds in your account may be delayed as described in our Funds Availability Policy Disclosure.</u> We may also pay checks of drafts, permit withdrawals, and make transfers from your account from <u>insufficient available funds</u> if you have established an overdraft protection plan or, if you do not have such a plan with us, according to our overdraft policy.

*Id.*

It relied on section 14, subsection (a) of the Account Agreement, captioned

"Overdrafts; Payment of Overdrafts," which provides in part:

> If, on any day, the <u>available funds</u> in your share or deposit account are not sufficient to pay the full amount of a check, draft, item, transaction or other item posted to your account plus any applicable fee ("Overdraft"), we may pay or return the Overdraft. The Credit Union's determination of an <u>insufficient available account balance </u>may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient <u>available funds</u> to pay an Overdraft.

*Id*.

The trial court identified the other agreements incorporated by the Account

Agreement including the Funds Availability Policy Disclosure and quoted the Overdraft

Protection document's explanation of events that affect the availability of funds:

7

No. 38047-5-III
*Silvey v. Numerica Credit Union*

> An <u>insufficient available balance</u> can result from several events, such as
> (1) the payment of checks, electronic funds transfers or other withdrawal
> requests; (2) payments authorized by you; (3) the return of unpaid items
> deposited by you; (4) credit union service charges; or (5) the deposit of
> items which according to the credit union's Funds Availability Policy are
> treated as not yet available or finally paid. We are not obligated to pay any
> item presented for payment if your account does not contain sufficient
> <u>available funds.</u>

CP at 539.

From these provisions, the trial court concluded that Numerica's contracts

consistently made clear that the available balance of an account is used, not the settled

ledger or actual balance, in determining whether an overdraft occurs. Finding no

reasonable basis for a consumer to construe "available funds" and "available balance" as

meaning ledger or actual balance, the trial court granted the motion to dismiss. Ms.

Silvey appeals.

## ANALYSIS

A motion to dismiss under CR 12(b)(6) for failure to state a claim turns on the

"sufficiency of the complaint, not its merits." *Fed. Nat'l Title Ins. Co. v. Intercounty*

*Nat'l Title Ins. Co.*, 161 F. Supp. 2d 876, 881 (2001). Dismissal under CR 12(b)(6) is

proper only where it appears beyond a reasonable doubt that no facts exist that would

justify recovery. *Cutler v. Phillips Petroleum Co.*, 124 Wn.2d 749, 755, 881 P.2d 216

(1994) (citing *Hoffer v. State*, 110 Wn.2d 415, 420, 755 P.2d 781 (1988)). Therefore, a

plaintiff's complaint will survive a CR 12(b)(6) motion so long as any statement of facts

No. 38047-5-III
*Silvey v. Numerica Credit Union*

exists under which the court could sustain the claim for relief. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 120, 744 P.2d 1032, 750 P.2d 254 (1987).

I.    THE CONTRACT DOCUMENTS SUBMITTED CANNOT REASONABLY BE CONSTRUED TO PROMISE THAT NUMERICA WILL ASSESS OVERDRAFT AND NSF FEES ON THE BASIS OF A MEMBER'S LEDGER BALANCE, NOT THEIR AVAILABLE BALANCE

To establish a claim for breach of contract, a plaintiff must show (1) a valid contract, (2) a breach of duty arising under that contract and (3) the resulting damage. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App 707, 712, 899 P.2d 6 (1995). At issue on appeal is Ms. Silvey's allegation that Numerica breached what she contends was its promise to assess overdraft and NSF fees on the basis of a member's ledger balance, not their available balance.

A contract may be attached as an exhibit to the plaintiff's complaint and when it is, it becomes part of the pleading for purposes of a motion under CR 12(b)(6). *P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d 198, 205, 289 P.3d 638 (2012). The mere fact that a contract is attached to the complaint and is considered by the court does not convert a CR 12(b)(6) motion to dismiss to a summary judgment motion. *Id.* at 205-06.

"The primary objective in contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014) (citing *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013)). Washington follows the "objective manifestation theory" of contract interpretation, under

9

No. 38047-5-III
*Silvey v. Numerica Credit Union*

which the focus is on the reasonable meaning of the contract language to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* at 504. And we view the contract as a whole, interpreting particular language in the context of other contract provisions. *See Weyerhaeuser Co. v. Com. Union Ins. Co.*, 142 Wn.2d 654, 669-70, 15 P.3d 115 (2000).

We interpret clear and unambiguous terms as a question of law. *Paradise Orchards Gen. P'ship v. Fearing*, 122 Wn. App. 507, 517, 94 P.3d 372 (2004). An ambiguous provision is one fairly susceptible to two different, reasonable interpretations. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992). A contract is not ambiguous simply because the parties suggest opposing meanings. *Wm. Dickson Co. v. Pierce County*, 128 Wn. App. 488, 493-94, 116 P.3d 409 (2005).

> *The parties' contracts provide no textual support for Ms. Silvey's contention that Numerica promised to assess overdraft and NSF fees on the basis of a member's ledger balance*

Ms. Silvey repeatedly alleges in her complaint that her agreements with Numerica provided that she would only be charged an overdraft fee on an item that would cause her account to have a "negative . . . balance" or "would place the account in the negative," and, she contends, her account "never went negative." *See* CP at 5-6, 14-15. None of the expressions "negative balance," "place the account in the negative," or "go negative"

10

No. 38047-5-III
*Silvey v. Numerica Credit Union*

appear in the agreements on which she relies, however. Even the word "negative"

appears only once, in a provision stating that Numerica can report negative information

about her deposit accounts to credit bureaus. CP at 28 (Account Agreement § 33).

The terms "ledger balance" and "actual balance" likewise do not appear in the

agreements on which she relies. Ms. Silvey can point to no direct textual support in

Numerica's agreements for the promise she claims was made.

*The agreements unambiguously disclose that there are policies under which the availability of deposits credited to a customer's Numerica account will be delayed*

Subsection 8(d) of the Account Agreement unambiguously states that "[a]ll items

or Automated Clearing House (ACH) transfers credited to your account are provisional

until we receive final payment." CP at 25. The ordinary, usual, and popular meaning of

"provisional" is "**1 :** provided for a temporary need **:** suitable or acceptable in the existing

situation but subject to change or nullification **:** TENTATIVE, CONDITIONAL." WEBSTER'S

THIRD NEW INTERNATIONAL DICTIONARY 1827 (1993).

Subsection 12(a) of the agreement unambiguously states that "[w]e will pay

checks or drafts, permit withdrawals and make transfers from available funds in your

account. The availability of funds in your account may be delayed as described in our

Funds Availability Policy Disclosure." CP at 25.

Numerica's member overdraft protection agreement states that an insufficient

available balance

11

No. 38047-5-III
*Silvey v. Numerica Credit Union*

can result from several events, such as (1) the payment of checks, electronic fund transfers or other withdrawal requests; (2) payments authorized by you; (3) the return of unpaid items deposited by you; (4) credit union service charges; or (5) the deposit of items which according to the credit union's Funds Availability Policy, are treated as not yet available or finally paid.

CP at 34.[4]

*The parties' contracts disclose that both sufficiency and availability of funds are conditions to Numerica's obligation to make transfers*

Having unambiguously disclosed that there are policies under which availability of funds can be delayed, Numerica's agreements unambiguously treat both the sufficiency and availability of funds as conditions to its obligation to make payments or transfers. Unlike Ms. Silvey's key terms, "negative," "actual balance," and "ledger balance," which never appear in the agreements on which she relies, the concept of sufficient and "available" funds and account balance is mentioned repeatedly. The ordinary, usual and popular meaning of "available" is "**3 :** such as may be availed of **:** capable of use for the

---

[4] At oral argument of the appeal, Numerica's counsel asked us to assume that the disclosures made to Ms. Silvey in the Overdraft Protection document had not been made at the time of the transactions about which she complains. He pointed out that the bottom of the member overdraft protection document bears a "Revision" date of "03.20.19." Wash. Court of Appeals oral argument, *Silvey v. Numerica Credit Union*, No. 38047-5-III (Jan. 25, 2022) at 1 min., 38 sec. to 2 min., 38 sec. (available from court); *see* CP at 34.

"Revised" suggests there was an earlier member overdraft protection document; Ms. Silvey's lawyer was asked about any such agreement and didn't know if one had existed but stated that if it had, it was not in the record. *Id.* At Ms. Silvey's request, we rely on this as a hypothetical fact. It does not make a difference in the outcome.

12

No. 38047-5-III
*Silvey v. Numerica Credit Union*

accomplishment of a purpose **:** immediately utilizable." WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 150 (1993).

Paragraph 10 of the Account Agreement states, "We are not obligated to execute

any order to transfer funds out of your account if the amount of the requested transfer

plus applicable fees exceeds the *available funds* in your account." CP at 25 (emphasis

added).

Paragraph 12 of the agreement states, "We will pay checks or drafts, permit

withdrawals and make transfers from *available funds* in your account. The *availability of*

*funds* in your account may be delayed as described in our *Funds Availability* Policy

Disclosure. We may also pay checks or drafts, permit withdrawals and make transfers

from your account from insufficient *available funds* if you have established an overdraft

protection plan or, if you do not have such a plan with us, according to our overdraft

policy." CP at 25 (emphasis added).

Paragraph 14(a) of the agreement states, "If, on any day, the *available funds* in

your share or deposit account are not sufficient to pay the full amount of a check, draft,

item, transaction or other item posted to your account plus any applicable fee

("Overdraft"), we may pay or return the Overdraft," "The Credit Union's determination

of an *insufficient available account balance* may be made at any time between

presentation and the Credit Union's midnight deadline with only one review of the

13

No. 38047-5-III
*Silvey v. Numerica Credit Union*

account required," and, "We do not have to notify you if your account does not have

*sufficient available funds* to pay an Overdraft." CP at 26 (emphasis added).

Ms. Silvey has not identified a meaning of "available" that would make these

disclosures consistent with her construction of the parties' agreements. She tries to

deflect attention from these extensive disclosures by simply asserting, repeatedly, that a

reasonable consumer would expect the ledger balance to be used, and suggesting that the

word "available" is surplusage, to be ignored.

Ms. Silvey offers no reason why, despite all this language to the contrary, a

reasonable consumer would expect the ledger balance to be used. Washington law

provides that where possible, we must construe a contract to give meaning and effect to

every word. *Stokes v. Polley*, 145 Wn.2d 341, 346-47, 37 P.3d 1211 (2001); *Diamond

"B" Constructors, Inc. v. Granite Falls Sch. Dist.*, 117 Wn. App. 157, 165, 70 P.3d 966

(2003) (citing *City of Seattle v. State*, 136 Wn.2d 693, 698, 965 P.2d 619 (1998)). "An

interpretation of a writing which gives effect to all of its provisions is favored over one

which renders some of the language meaningless or ineffective." *Wagner v. Wagner*,

95 Wn.2d 94, 101, 621 P.2d 1279 (1980). "[E]very word and phrase must be presumed

to have been employed with a purpose and must be given a meaning and effect whenever

reasonably possible." *Ball v. Stokely Foods, Inc.*, 37 Wn.2d 79, 83, 221 P.2d 832 (1950).

Finally, Ms. Silvey argues that because the provisions of Numerica's agreements

did not clearly explain that *debts* that are not yet settled will reduce available funds, the

14

No. 38047-5-III
*Silvey v. Numerica Credit Union*

agreements are ambiguous. Numerica disagrees.[5] It also labels this argument a red

herring, and we agree. Ms. Silvey does not prove a breach of contract by showing that

Numerica's explanation of its calculation of available funds could have been more

complete.[6] She must show that Numerica's agreements can reasonably be construed as

promising to assess overdraft and NSF fees on the basis of a member's ledger balance,

and this she has clearly failed to do.

---

[5] It points to subsection 12(a) of the Account Agreement, which explains that withdrawal may not be allowed if "the account secures any obligations to us," and the statement in the member overdraft protection disclosure that an insufficient available balance can result from, among other things, "payments authorized by you." CP at 26, 34.

[6] Numerica also responds that any argument that its disclosures are insufficiently detailed as opposed to false or misleading is preempted by the National Credit Union Administration's regulations implementing the Federal Credit Union Act and Truth in Savings Act (TISA).

The TISA implementing regulations require federal credit unions to provide disclosures regarding "[t]he amount of any fee that may be imposed in connection with the account . . . and the conditions under which the fee may be imposed." 12 CFR § 707.4(b)(4). They expressly preempt any "[s]tate law requirements that are inconsistent with the requirements of the TISA and [its implementing regulations]." 12 CFR § 707.1(d). More specifically, 12 CFR § 701.35(c) provides that a federal credit union may, consistent with the implementing regulations, federal law, and its contractual obligations, "determine the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account," and, "State laws regulating such activities are not applicable to federal credit unions."

While true breach of contract and affirmative misrepresentation claims under state law are not federally preempted, "it is well established that state law claims regarding a federal credit union's *failure to disclose certain fee practices* or any perceived unfairness in the fee practices themselves are preempted." *Lambert v. Navy Fed. Credit Union*, No. 1:19-CV-103-LO-MSN, 2019 WL 3843064, at *2 (E.D. Va. Aug. 14, 2019) (court order) (citing *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 725 (9th Cir. 2012); *Whittington v. Mobiloil Fed. Credit Union*, No. 1:16-CV-482, 2017 WL 6988193, at *9 (E.D. Tex. Sept. 14, 2017) (court order).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38047-5-III
*Silvey v. Numerica Credit Union*

By repeatedly providing that a member's account balance must be both sufficient *and* available, the Numerica agreements unambiguously made the "availability" of account funds a condition to avoiding an overdraft.

*Better-reasoned cases from other jurisdictions having similar fact patterns support our analysis*

Below and on appeal, both parties have cited many out-of-state, mostly unpublished, mostly trial court rulings in which similar lawsuits have or have not been dismissed for failure to state a claim. The decisions are unhelpful, not only because they are not precedential, but also because each case turns on the specific language of the parties' agreements. Few involve customer agreements that repeatedly disclose that to avoid an overdraft fee, an accountholder not only needs to have "enough" or "sufficient" funds in her account, but those funds also need to be "available." We briefly address the several decisions that the parties argue present the most similar facts.

Numerica points to *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016), in which the putative class action was dismissed under Fed. R. Civ. P. 12(b)(6). The opening paragraph of the credit union's opt-in agreement gave examples of when a customer might find herself without enough money to cover a transaction, such as when she "'inadvertently miscalculate[s her] '*available balance*'" or "'when funds from a recent transaction are *not available*.'" *Id.* at 10 (emphasis added) (alterations in original) (internal quotation marks omitted). The district court observed that "[b]y

16

No. 38047-5-III
*Silvey v. Numerica Credit Union*

specifically invoking the phrase 'available balance,' the opt-in agreement makes clear

that balance will be used in calculating overdrafts and imposing fees. There is no

competing reference to an actual or ledger balance." *Id.*

The district court in *Chambers* observed that the credit union's account agreement

also established the connection between the customer's "available balance" and

overdrafts. It included a provision captioned "*Available Balances* to Make

Transactions," which read, "You authorize us to charge the account you designate for

each Transaction and you will have sufficient collected funds *available* in the account for

that purpose." *Id.* The same section continued "If, on the other hand, 'any Transaction

you request exceeds the *balance of available collected funds* in the account either at the

time you request the transaction or at any later time that your account is scheduled to be

debited, we need not make such Transaction and will not be liable to you if we don't.'"

*Id.* at 10-11.

Chambers had argued that the court was reading too much into the repeated

requirement that funds be "available," suggesting maybe *all* account funds were

available, in which case the word "available" added nothing. Like us, the court found

this argument unpersuasive, explaining,

> When the account agreement refers to "available" funds, it must be
> referring to a subset of funds unencumbered by . . . restrictions—exactly
> the type of restrictions that can create a divergence between the actual
> and available balances in the first place.

17

No. 38047-5-III
*Silvey v. Numerica Credit Union*

*Id.* at 11.

Finally, Chambers complained that even if the credit union's agreement disclosed that some account funds could be unavailable and why, it did not disclose that funds earmarked for pending debit transactions would be unavailable. The district court observed that even if true, that argument "brings Chambers no closer to identifying a promise by the Credit Union to impose overdraft fees only on debit transactions that overdrew her actual balance—a necessary element of her claim." *Id.*

Numerica also relies on *Domann v. Summit Credit Union*, No. 18-CV-167-SLC, 2018 WL 4374076 (W.D. Wis. Sept. 13, 2018) (court order)—an unpublished decision, but one in which the language in the credit union's agreements mirrors the exact language used in paragraphs 10, 12(a), and 14(a) of Numerica's Account Agreement. *See id.* at *6.

Observing that the term "available" is used to modify the term "funds" or "account balance" several times throughout the account agreement, including three times in the Overdrafts section, the district court reasoned:

> If this term meant "all of the funds" in the member's account, as Domann urges, then the adjective "available" would be meaningless and unnecessary. Such a construction would violate the rule that "a construction which gives effect to every word of a contract should be preferred to one which results in surplusage." *McCullough v. Brandt*, 34 Wis. 2d 102, 106, 148 N.W. 2d 718 (1967) (citation omitted). The word "available" has meaning only if it denotes something other than "all of the funds" or "actual balance."

18

No. 38047-5-III
*Silvey v. Numerica Credit Union*

*Id.* The court also observed that the funds availability policy—by informing members that the entirety of funds deposited in the account will not necessarily be available on the day the deposit is received, "conveys clearly that there may be a difference between the actual balance on a member's account and the amount of funds that are 'available' for the member to use." *Id.*

Ms. Silvey places her principal reliance on *Tims v. LGE Community Credit Union*, 935 F.3d 1228 (11th Cir. 2019). The Eleventh Circuit in *Tims* rejected the plaintiff's argument that her contract with the credit union unambiguously provided that it would use the ledger balance method in imposing overdraft fees. It held that the contract was ambiguous, and the parties' intent would become a question for the jury should neither party be granted summary judgment. *Id.* at 1242.

Unlike the repeated references to "available" funds and balances in Ms. Silvey's account agreement, Ms. Tims's account agreement was described as using the term "available" infrequently, and tending to use "sufficient" and "available" interchangeably, not together. The Eleventh Circuit court characterized the credit union as "assum[ing] too much" when it assumed a consumer would read the word "available" in only two separate sections, spanning a 12-page account agreement, and conclude her financial institution would use the available balance calculation method in addressing overdrafts. *Id.* at 1239.

19

No. 38047-5-III
*Silvey v. Numerica Credit Union*

Urged by the credit union to dismiss Ms. Tims's claim as the D.C. district court had dismissed the proposed class action complaint in *Chambers*, the Eleventh Circuit did not criticize *Chambers*' analysis, instead explaining that "[s]everal significant details distinguish *Chambers* from this case." *Id.* at 1242. "Importantly," the *Tims* court observed, the agreements in *Chambers*, unlike in Ms. Tims's agreement, "use[d] the phrase 'available balance.'" *Id.* Like the agreement in *Chambers*, Numerica's Account Agreement speaks not only of available funds, but also of an available account balance. CP at 26 (§ 14(a)).

The *Tims* court next observed that the account agreement in *Chambers* "linked the concept of available balance to the mechanics of when and how the bank would assess overdrafts," something not present in Ms. Tims's case. *Id.* Section 14(a) of Numerica's account agreement does that as well.

Finally, the *Tims* court observed that unlike the credit union agreement before it, the agreements in *Chambers* provided examples of when an account would not have "'enough money'" and thus be subject to an overdraft. 935 F.3d at 1242 (quoting *Chambers*, 222 F. Supp. 3d at 11; Numerica's Account Agreement states that availability of funds may be delayed as described in the Funds Availability Policy Disclosure, CP at 25; the Overdraft Protection document also provides examples. CP at 34. The Eleventh Circuit's reasoning therefore supports the dismissal of Ms. Silvey's complaint.

20

No. 38047-5-III
*Silvey v. Numerica Credit Union*

II.     MS. SILVEY FAILS TO STATE A CONSUMER PROTECTION ACT CLAIM

In addition to alleging breach of contract, Ms. Silvey's complaint had asserted a claim for violation of the Washington Consumer Protection Act (CPA), chapter 19.86 RCW.  Ms. Silvey argues that even if we affirm dismissal of her breach of contract claim, we should hold that Numerica failed to demonstrate that there are no facts under which the trial court could find that the credit union's practices are unfair and deceptive under the CPA.

To establish a CPA claim, a plaintiff must show five elements: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) that affects the public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered.  *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 782, 295 P.3d 1179 (2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986)).  A finding that any element is missing is fatal to a claim.  *Hangman Ridge*, 105 Wn.2d at 793.

Whether an alleged act or practice constitutes an unfair or deceptive act or practice in violation of the CPA is generally a question of law, which this court reviews de novo.  *See Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs., PLLC*, 168 Wn.2d 421, 442, 228 P.3d 1260 (2010).

21

No. 38047-5-III
*Silvey v. Numerica Credit Union*

Ms. Silvey's complaint alleges that the unfair and deceptive conduct on which she relies for her CPA claim are "Numerica's common courses of conduct alleged above." CP at 19. Aside from her now-settled-and-dismissed allegations that Numerica charged more than one NSF fee per presented and rejected item, Ms. Silvey alleged only that Numerica breached what she contends was its contractual promise to assess overdraft and NSF fees on the basis of a member's ledger balance, not their available balance. *See* CP at 14-17.

As the changes to Numerica's Fee Schedule explain, if a member opts into Numerica's Courtesy Pay protection, then,

> in addition to our Standard [Overdraft] Protection, we will cover ATM transactions and everyday debit card transactions. Again, there is a fee of $30 for each item paid, up to five fees ($150) per day. If you don't use it, there's no fee.

CP at 31. When a member chooses to opt into this additional overdraft protection and relies on it to make an ATM withdrawal or debit card transaction that could contribute to an overdraft, Ms. Silvey does not demonstrate why it is unreasonable or deceptive for Numerica to protect itself and other members from risk by treating those approved, pending but unsettled transactions as reducing the available funds in the member's account.

Ms. Silvey invokes a report in the CFPB's Winter 2015 Supervisory Highlights publication about supervisory action the CFPB took at that time against institutions that

22

No. 38047-5-III
*Silvey v. Numerica Credit Union*

made changes from a ledger balance to an available balance method that "were not disclosed at all, or were not sufficiently disclosed," with materially misleading results to customers. CFPB, Supervisory Highlights, *supra*, at 8. That is not conduct alleged against Numerica.

Ms. Silvey finally argues that Numerica may be liable for deceptive conduct by imposing overdraft fees without disclosing a customer's available account balance, citing *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wasington, Inc.*, 162 Wn.2d 59, 74-75, 170 P.3d 10 (2007). Br. of Appellant at 33. In *Indoor Billboard*, the Supreme Court found an unfair or deceptive act or practice as a matter of law where Integra Telecom assessed a surcharge it imposed on local business service customers as a "presubscribed interexchange carrier charge" or "PICC." The Federal Communication Commission (FCC) regulations authorize some carriers to impose PICCs on some other carriers, but those regulations did not authorize Integra to impose a PICC on Indoor Billboard or other customers. The court held that Integra's use of the term had the capacity to deceive a substantial portion of the public into thinking the surcharge was FCC regulated and required. *Indoor Billboard*, 162 Wn.2d at 78. For Numerica to impose an overdraft fee where it discloses that payments and fees are based on a member's available balance, but without real-time reporting of that balance, bears no relation to the deceptive conduct found in *Indoor Billboard.*

23

No. 38047-5-III
*Silvey v. Numerica Credit Union*

III.    MS. SILVEY LIKEWISE FAILS TO STATE A CLAIM THAT NUMERICA BREACHED THE
        IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Finally, Ms. Silvey's complaint alleged a breach of the covenant of good faith and fair dealing that she argues can survive the dismissal of her breach of contract claim.

Under Washington law, "[t]here is in every contract an implied duty of good faith and fair dealing" that "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). The implied covenant of good faith and fair dealing cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties. *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 112-13, 323 P.3d 1036 (2014). Instead, "the duty [of good faith and fair dealing] arises only in connection with terms agreed to by the parties." *Id.* at 113 (alteration in original).

One circumstance in which the duty applies is when "one party has discretionary authority to determine a contract term." *Id.* (citing *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997)). "'The covenant may be relied upon only when the manner of performance under a specific contract term *allows for discretion on the part of either party. . . .* However, it will not contradict terms or conditions for which a party has bargained.'" *Goodyear Tire*, 86 Wn. App. at 739 (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)).

24

No. 38047-5-III
*Silvey v. Numerica Credit Union*

Ms. Silvey argues she can challenge Numerica's good faith in exercising its discretion whether to pay overdrafts and assess an NSF or overdraft fee—but her challenge is not to the overdraft decision, it is to Numerica's alleged bad faith in employing the available balance method. We have already held that the available balance method is the method contractually provided by Numerica's agreements.

Numerica's agreement does not give it "discretion" to apply the available balance or ledger balance method. Its agreement calls for using the available balance method. Its agreement gives it discretion, *when applying the available balance method*, whether to pay an overdraft and assess a fee. Ms. Silvey has not articulated any respect in which Numerica has abused that discretion. No claim for breach of the covenant is stated.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Fearing, J.

Pennell, J.

25